Filed 5/29/20; Certified for Publication 6/17/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.M., JR., a Person Coming Under the Juvenile Court Law. | B298473, B301428 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> Y.C., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK22314) |

APPEALS from orders of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Reversed with directions.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

In two separate appeals, Y.C. (Mother) challenges three juvenile court orders regarding her son, J.M., Jr. (J.M.). In her first appeal (case No. B298473), Mother challenges the court's denial of a January 19, 2019 Welfare and Institutions Code section 388[1] petition for modification—joined by J.M.— through which Mother sought to have J.M. placed with her or, in the alternative, further reunification services. We conclude that the trial court abused its discretion in denying this petition and reverse.

Following termination of her reunification services, Mother addressed the domestic violence issues that comprised the entire basis for the sustained dependency petition regarding J.M. She also addressed various additional concerns the court and respondent Los Angeles County Department of Children and Family Services (DCFS) raised throughout the proceedings. Specifically, the court required efforts from Mother wholly unrelated to domestic violence, such as improving her living conditions, completing drug testing, and receiving mental health services. Mother complied. Thus, since termination of her reunification services, Mother not only successfully completed all programs to address domestic violence issues, but did everything else the court asked of her.

That Mother ameliorated all concerns leading to dependency court jurisdiction constitutes a substantial change in circumstances. Moreover, Mother presented evidence that, in light of this change in circumstances and the record as a whole, it was in J.M.'s best interests to be placed with her. Namely,

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

2

Mother provided evidence—including testimony of a DCFS social worker—that she was ready, willing, and able to care for her son, that they had a growing bond, and that she posed no danger to him.  The court's primary reason for denying the petition was a concern that Mother had not provided sufficient evidence to address the court's concern that she was not capable of caring for J.M.'s special needs, such as evidence reflecting she had been "trained" on how to do so.  That concern, however, was unsupported by the record and was based on unwarranted speculation.  The record contains no evidence suggesting Mother could not appropriately care for her son.  Rather, it reflects only that J.M.'s long-term foster caregivers had more experience with doing so—and had done so without first receiving any "training." Accordingly, the court abused its discretion in not granting Mother's petition.

Even after the termination of reunification services, at which point a juvenile court focuses primarily on stability and permanency for the child, the court's analysis must be more nuanced than simply comparing a parent's home and abilities with those of a long-term caregiver and deciding which the court deems preferable.  Although, at this stage, a *parent*'s interest in maintaining a relationship with his or her biological child is no longer the focus, the court must still consider the benefits to *a child* of remaining connected with his or her biological parent and extended family.  Here, the benefits to J.M. of remaining connected with a biological parent who has made the kind of "reformation" for which section 388 creates an "escape mechanism" (see *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528 (*Kimberly F.*)), overcome the presumption that her son remaining in a stable and potentially permanent foster home is

in his best interests.  (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*).)  The juvenile court erred in concluding otherwise.  Accordingly, we reverse the court's May 15, 2019 order denying Mother's section 388 petition, and instruct the court to place J.M. with Mother.

This disposition of Mother's first appeal necessarily requires reversal of the September 30, 2019 orders that are the subject of Mother's second appeal (case No. B301428)—namely, an order denying an August 13, 2019 section 388 petition in which Mother, joined by J.M., again sought reunification services or placement, and the order terminating her parental rights.

## BACKGROUND

### I. Factual and Procedural History Relevant to Mother's First Appeal (B298473)

#### A. *Initial Referral and Petition*

On March 13, 2017, DCFS received a referral alleging general neglect of J.M. (born January 2017) by Mother and J.M.'s father, J.M., Sr. (Father), due to domestic violence.  The referral alleged that the prior evening Mother sent messages to a relative stating that Father had hit her and threatened to stab her with a knife.  When the police responded, Mother was uncooperative and denied that there had been domestic violence, even though she had bruises on her forehead and arm.  J.M. was asleep in the home during the domestic violence incident.  He appeared healthy and clean and had no marks or bruises.

The initial petition DCFS filed on behalf of J.M. sought jurisdiction over the child based on Mother and Father having a history of engaging in violent altercations, the March 12, 2017 incident, Father's conviction for battery, Mother's failure to

4

protect J.M., and allegations that Mother had a diagnosis of bipolar disorder and had failed to seek mental health treatment or take psychotropic medication as prescribed. Crucially, the court sustained the petition based on the allegations related to domestic violence only; it struck all other allegations in the petition.

The court removed J.M., then two months old, from Mother and Father, and placed him in foster care with M.F. (Caregiver) and her husband (collectively, Caregivers), with whom J.M. remains placed. The court granted Mother[2] monitored visitation with the option for DCFS to permit Mother unmonitored visits at DCFS's offices. Mother was granted family reunification services, including domestic violence and parenting classes and individual counseling. Her case plan further required that she submit to a psychiatric evaluation and take any psychotropic medications prescribed.

## B. *Mother Is Granted, then Loses, Overnight Visitation with J.M.*

Mother visited J.M. consistently over the next several months. She was very attentive during visits, hugging, holding and taking pictures of J.M. She expressed that she missed her son and wanted him to be returned to her care.

In November 2017, she reported that she had moved out of Father's home and was renting a room on her own. It was not

---

[2] Because Father is not a party to this appeal and no longer participating in dependency proceedings, we do not include the details of the court's earlier orders relating to Father's case plan and visitation.

5

until this point in the proceedings that Mother acknowledged there had been domestic violence issues with Father.

November 2017 progress notes from the County of Los Angeles Department of Mental Health (DMH) reflect that Mother had consulted with a DMH psychiatrist about her lack of bipolar symptoms and her desire to discontinue her medications. The psychiatrist indicated Mother could try weaning off her medications gradually, and Mother agreed to resume all her medications, should she start feeling emotionally unstable.

In December 2017, after Mother had completed three successful unmonitored daytime visits, the court ordered DCFS to assess her home for overnight visits. On January 19, 2018, the juvenile court granted Mother a 29-day visit with J.M. at her home. The court did so despite DCFS objections to the size and condition of Mother's home, a very small room in a converted garage with no crawl or play space for the baby and no kitchen for Mother to cook food, and in which Mother also kept a small dog. Although the court permitted the 29-day visit, it also ordered DCFS to confirm Mother's home was properly permitted. The court further directed Mother to find a more suitable place for an infant.

As of January 31, 2018, per DMH progress notes, Mother's bipolar disorder was "on remission," and, at her request, Mother was not being prescribed any medication.

In February 2018, DCFS asked the court to terminate Mother's 29-day visit. It reported that Mother's unit violated zoning laws and that Mother was resistant to and no longer participating in domestic violence training, had discontinued individual therapy, and was not taking psychotropic medication. DCFS also reported that Mother had repeatedly denied her lack

of compliance and insisted she did not need medication. DCFS noted further concerns that Mother maintained her home in a manner that was unsafe for an infant; for example, it noted concerns that J.M. was observed sleeping in a crib that contained a mechanical pencil and medication. Mother contested these reports and accused social workers of fabricating the hazards they identified. Mother also reported her efforts to work additional hours so she could earn enough money to afford a new home.

On February 16, 2018, the court rescinded Mother's 29-day visit and returned J.M. to Caregiver. The court explained that Mother had indicated a month prior that she would move into safe, permitted housing, but failed to do so, and that living in an unpermitted home could result in her summarily losing her housing at any point, should the violation be reported. The court further expressed concern that Mother might be in contact with Father, given a DCFS report that, during a surprise visit, a social worker had observed a man "approaching the back where [M]other's room was located" but "when he noticed [the social worker], he immediately turned around and walked away" "fast" and "[Mother's] dog followed the individual." The court ordered Mother to stay 100 yards away from and have no contact with Father. The court granted Mother monitored visitation with DCFS discretion to authorize overnight visits or release J.M. to Mother if she moved into a more suitable home and complied with other court orders. The court further ordered Mother to submit to weekly and on-demand drug tests.

The court acknowledged that Mother had "consistently, regularly contacted and visited and made significant progress in resolving the problems that led to the removal and ha[d]

demonstrated the capacity and ability to complete the objectives of the treatment plan." The court therefore ordered six months of further reunification services (in addition to the approximately nine months Mother already received), but granted DCFS's request that Mother submit to a mental health evaluation.

## C.    *Termination of Reunification Services*

In the reunification period that followed, Mother made some positive progress with her case plan and maintained continuous, positive visits with her son. By all accounts, Mother was caring, attentive, protective, and loving during her weekly monitored visits with J.M., and brought J.M. toys, clothing, shoes, and bottles. DCFS reported no concerns regarding Mother's conduct during visits. Mother completed all required courses and counseling, and started a new job as a truck dispatcher, which allowed her to work at night from home, using a computer and cellular phone. She had participated consistently in individual therapy since February 2018, and was cooperative and engaged in sessions, openly sharing her history of trauma. According to a letter from Mother's therapist during this period, Mother demonstrated an increased insight into how past events had led up to her current situation and involvement with DCFS, and was working on identifying environmental stressors that have affected her mental health and behaviors. Mother had also learned strategies to help effectively respond to stressors. Although not required to do so by the court, and although DCFS did not report any problems or concerns with respect to anger management, Mother also participated in anger management training.

Also during this period, however, Mother violated the court's no-contact order regarding Father, which came to the

8

attention of DCFS because Mother was arrested while traveling with Father on a train and charged with obstructing a police officer.[3]  This incident occurred two days after the court issued its no-contact order.

Mother also had not complied with the court's order to complete a mental health evaluation, although she stated that she had an appointment for the evaluation.  As a result, DCFS reported it was "unknown whether or not [M]other ha[d] any unresolved mental health issues."  DCFS did not, however, report any facts suggesting Mother's mental state or mental health presented a current risk to J.M., or that it had previously presented such a risk.  Mother was largely compliant with her drug testing, but had tested positive for marijuana on five occasions.

On September 19, 2018, the court terminated family reunification services for Mother, consistent with DCFS's recommendation.  Mother thus received a total of 16 months of reunification services, from May 2017 to September 2018.  The court explained that, although Mother had completed most of her reunification requirements, she had violated the stay-away order by being arrested with Father, that she was still living in an illegal unit from which she could be summarily evicted, and that the presumptive statutory duration of reunification services for a child as young as J.M. had expired.  (See § 361.5, subd. (a)(1)(B).)  The court said it would consider whether to reinstate reunification services if Mother moved to a domestic violence shelter or other appropriate housing, had no contact

_____

[3] Arrest records reflect that Mother was in jail for eight days, pleaded guilty to another charge, convicted of a misdemeanor, and sentenced to three years of probation.

with Father, and complied with all other court orders. The court provided Mother with information on government-assisted affordable housing that could be made available within a short period of time. The court set a section 366.26 permanency planning hearing and granted Mother unmonitored visits with J.M. once a week with DCFS discretion to liberalize.

Mother filed a petition for extraordinary writ challenging the juvenile court's orders terminating family reunification services and declining to return J.M. to her custody. This court summarily denied the petition on December 12, 2018.

### D.  *J.M. Receives Treatment for Autism and Developmental Issues and Continues Positive Visits with Mother*

Mother continued regular visits with J.M. once a week at a mall, the movies, or the zoo. DCFS increased the duration of these visits to six hours a week. During the visits, Mother would feed and teach J.M. how to eat different foods, play with him and push him on the swings, and was very affectionate towards him. Neither DCFS nor Caregiver reported any concerns about the visits, noting that Mother consistently arrived on time and appeared prepared. Reports from these visits reflected that J.M. was becoming increasingly comfortable with and connected to Mother, although he remained bonded with Caregivers as well.

In late 2018, J.M. was diagnosed with various developmental and other issues and began receiving services to address them. First, in September 2018, J.M. was diagnosed with autism. J.M. started "Applied Behavioral Analysis [(ABA)] therapy from Easter Seals [five times] a week" to address his autism and related behavioral issues. Due to his young age, the

diagnosing pediatrician could not identify where he was on the autism spectrum.

In December 2018, J.M. began losing language skills, something that Caregiver suspected may have been related to fluid in his ears, and he was evaluated by a speech therapist. The results of the speech and language evaluation revealed that J.M. had a receptive-expressive language delay, five to eight months below age expectations. The evaluation recommended speech and language therapy and a hearing evaluation. Around this time, J.M. began using sign language to communicate with Caregiver.

In January 2019, J.M. was evaluated by the Lanterman Regional Center due to his "speech and language delay" and because he "is aggressive if he does not get his way, bangs his head, has limited eye contact, [and is] not always responsive to his name." He began receiving 19 hours of services a week, comprised of speech therapy, "occupational therapy services," and the Easter Seals ABA therapy for his autism. Despite these difficulties, J.M.'s evaluators noted he was able to complete many age-appropriate tasks, such as drinking from a cup, pulling himself up to a standing position, walking, throwing and kicking a ball, and following directions.

### E.    *Mother's January 2019 Petition for Modification*

Approximately three months after services were terminated, on January 14, 2019, Mother filed a petition pursuant to section 388 seeking to modify the court's order terminating reunification services and vacate the section 366.26 hearing. Mother sought placement of J.M. with her or, in the alternative, further reunification services with overnight visits.

11

Mother argued that she had addressed all of the concerns the court had identified when it terminated reunification services. Mother had rented a new DCFS-approved home, and reported having had no contact with Father since her arrest with him in February 2018. She had been drug testing and receiving negative results, and her bipolar issues were "on remission."

Mother further argued that it would be in J.M.'s best interests for the court to return J.M. to her care, or at least permit her to continue to work towards reunification, given the relationship with her son that she had been maintaining through regular visits. These visits had been improving, as reflected in DCFS's decision to liberalize visits to be unmonitored. Mother had also made arrangements for J.M. to be properly cared for while she worked, if he were returned to her care.

At a May 15, 2019 hearing, J.M.'s counsel joined Mother's petition and argued strongly in favor of returning J.M. to Mother. Mother offered documentary evidence of a one-year lease at her new DCFS-approved home, as well as her own testimony. She testified that she had completed the required reunification services, had a full-time job as a truck dispatcher that would allow her to work from home at night while J.M. was asleep, something she had already discussed with her supervisor. She testified J.M.'s paternal grandmother and Caregiver had agreed to help with childcare as needed during the daytime while Mother slept. Mother further testified that she believed she was capable of caring for J.M. and his special needs; she knew about his weekly therapy appointments and could host them at her new home. Although DCFS had reported some reluctance on Mother's part to J.M. using sign language and/or to Mother learning to use it as well, Mother testified that she

approved of J.M. learning sign language, would participate in any required classes or appointments for him as necessary, and had been watching YouTube videos to learn basic words, two of which she demonstrated for the court. She denied Caregiver's stipulated testimony that Caregiver had invited Mother to participate in the sign language instruction. Mother testified she was also aware of J.M.'s routine doctor visits, but had not attended any because Caregiver had not adequately informed her about the appointments.

Charlene Nunez, a social worker who had monitored J.M.'s visits with Mother, testified that she saw no indication Mother was unable to meet J.M.'s behavioral needs, that Mother "soothed him when he was upset," and that Mother "made efforts to engage with him" even though he was "on the autism spectrum," "difficult to engage with," and "didn't like change." Nunez described Mother as being "[a]ttentive," "loving," and "patient" with J.M. She further testified that although J.M. had initially appeared "indifferent" about visits with Mother, as the visits progressed, he seemed "pleased to see her" and showed this by "smiling [and] reaching out." Stipulated testimony from Caregiver reflected that Mother had purchased toys, clothes, and a children's tablet for J.M., and would wash J.M.'s clothing if it became soiled, then return it to Caregiver at the next visit.

The court considered an interim review report dated February 8, 2019, in which DCFS reported that Mother was only "partially compliant with her court ordered services" because she "ha[d] yet to receive a psychiatric assessment, which was ordered on [February 16, 2018]" and DCFS had been unable to obtain certain mental health records. DCFS did not report any facts

suggesting that Mother's mental state or mental health put J.M. at risk. Nevertheless, citing concerns about her mental health, DCFS had not liberalized Mother's visits to overnight, despite her repeated requests that it do so. Mother attempted to offer evidence to establish that DCFS "creat[ed] artificial blockades" to obtaining her mental health records, including testimony of a DMH worker who had interfaced with DCFS regarding Mother's case. In addition, according to Mother's counsel, the records DCFS was seeking were known to DCFS at the time the department cited them as a basis for denying overnight visits. The court declined to consider any such evidence or argument, explaining that "[d]irtying up [DCFS] workers doesn't make [Mother] any cleaner."

In a last minute information report submitted to the court in April 2019, DCFS acknowledged that Mother's mental health records "do not discuss any need of medication," and the records themselves further reflect that, as of February 2019, the DMH had concluded that "[n]o further follow[-]up [was] required as [Mother] does not meet medical necessity for specialty mental health services and client is not interested in participating in mental health services."

Although DCFS focused on Mother's mental health and questioned her bond with J.M., the court did not view these issues as driving factors in ruling on Mother's petition. It stated that mental health issues were not a basis for its decision, and acknowledged that J.M. was bonded to Mother to a certain extent and "glad to see [her]" during visits. The court identified as "[t]he real issue" whether Mother could "do what needs to be done for this child . . . [with] special needs." The court found it did not "have any . . . concrete evidence" to that effect, such as

14

evidence that Mother had "been trained on how to deal with these issues or that [she was] taking recognized training . . . or . . . ready, willing and able to take the child to lessons." No evidence was presented, however, as to what type of "training," if any, Mother might need.

Based on Mother's failure to be truthful with the court in the past, the court "ha[d] issues about her credibility" and deemed her testimony insufficient to establish that she would be able to handle J.M.'s care and special needs while working nights in the manner she proposed. More specifically, the court noted that Mother had failed to offer evidence beyond her own testimony that the paternal grandmother and/or Caregiver would be willing to provide childcare whenever Mother was unavailable (such as declarations of paternal grandmother and Caregiver), or that she was capable of caring for a child with special needs while working full-time. The court therefore denied Mother's petition. Mother timely appealed the court's denial.[4]

## II. Procedural Developments Since Mother's First Appeal

Following the denial of her January 2019 modification petition, Mother continued to seek overnight visits, and the court continued to leave this in the discretion of DCFS. DCFS declined to do so.

On August 13, 2019, Mother filed another section 388 petition, again requesting that the court return J.M. to her or, alternatively, grant her additional reunification services and overnight visits. J.M. again joined the petition.

---

[4] J.M. appealed as well, but subsequently dismissed his appeal.

The court held a hearing and denied the petition. Immediately thereafter, the court found J.M. was adoptable and that adoption was in his best interests. It rejected Mother's contention that she had established a parental relationship with J.M. significant enough to warrant application of the parental relationship exception to adoption and terminated her parental rights.

Mother timely appealed the court's orders denying Mother's August 2019 petition for modification and terminating her parental rights. We consolidated Mother's appeal from this order and Mother's appeal from the court's earlier order denying Mother's January 2019 petition for modification.

## DISCUSSION

We first consider whether the juvenile court committed reversible error when it denied Mother's January 14, 2019 modification petition.

Section 388 allows a parent to petition to change, modify, or set aside any previous juvenile court order. (§ 388, subd. (a).) "The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.) "[T]he change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223; see also *In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615 [change must be genuine and " 'of such significant nature that it requires a setting aside or modification of the challenged prior order' "].)

The section 388 modification procedure is an " 'escape mechanism' when parents complete a reformation in the short,

16

final period after the termination of reunification services but before the actual termination of parental rights." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 528; see *Marilyn H., supra,* 5 Cal.4th at p. 309 ["the Legislature has provided the procedure pursuant to section 388 to accommodate the possibility that circumstances may change after the reunification period that may justify a change in a prior reunification order"].) We review a juvenile court's denial of a section 388 petition for abuse of discretion, and review its factual findings for substantial evidence. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) We may disturb the exercise of the court's discretion only when the court has made an unreasonable or arbitrary determination. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 (*Stephanie M.*).)

## A.    *Mother's Petition Established a Substantial Change in Circumstances*

A parent establishes a substantial change of circumstances for purposes of section 388 by showing that, during the period between termination of reunification services and the permanency planning hearing, he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction. (See *In re A.A.* (2012) 203 Cal.App.4th 597, 611–612 ["The change in circumstances" must be such that "the problem that initially brought the child within the dependency system must be removed or ameliorated. [Citation.] The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order."].) Mother made such a showing. Namely, she offered substantial evidence that she had resolved the domestic violence underlying the initial dependency petition: She had not been in contact with Father for over a year, had completed all required

17

domestic violence training, and nothing suggested Mother was or had been in another potentially violent or abusive relationship.

Moreover, Mother offered evidence that she had also addressed the myriad of other concerns—completely unrelated to any risk of domestic violence—that the court raised in terminating her reunification services. Namely, she offered uncontroverted evidence that she had stable and permitted housing, participated in individual therapy, completed parenting and anger management programs, and no longer needed any psychotropic medications or mental health services. The court made no findings to the contrary.

Thus, Mother presented ample evidence that she had addressed the sole basis for juvenile court jurisdiction—domestic violence—as well as every other concern cited by the court in its order terminating reunification services. This constitutes a substantial change for the purposes of Mother's section 388 petition, and the trial court abused its discretion in concluding otherwise.

### B. *The Trial Court Abused Its Discretion in Concluding Placement with Mother Would Not Be in J.M.'s Best Interests*

The more difficult question presented by Mother's petition is whether, in light of these changed circumstances and the evidence in the record as a whole (see *In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1450–1451), returning J.M. to her care and/or permitting her additional reunification services would have been in J.M.'s best interests—the "ultimate question" on a section 388 petition. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.)

18

After reunification services have been terminated, there is "a rebuttable presumption that continued foster care is in the child's best interests." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 448; *Marilyn H., supra,* 5 Cal.4th at p. 310.) This presumption arises because, post-reunification, "the parents' interest in the care, custody and companionship of the child are no longer of overriding concern. [Citation.] The focus then shifts to the child's need for permanency and stability." (*In re Aaliyah R., supra*, 136 Cal.App.4th at p. 448.) The presumption is especially difficult to overcome when adoption is the permanent plan. (*Id.* at pp. 448–449.)

But this presumption cannot mean any section 388 petition is automatically doomed to fail when it seeks return of a child currently doing well in a potentially permanent placement. The California Supreme Court has made clear that section 388 plays a vital role in preserving due process in dependency proceedings overall. Namely, the Court has held that it is only when read in conjunction with the "escape mechanism" section 388 procedures create that the limited options available at a selection and implementation hearing under section 366.26 comply with due process. (*Marilyn H., supra,* 5 Cal.4th at p. 309 ["Section 388 provides the 'escape mechanism' that [the] mother maintains must be built into the process to allow the court to consider new information. [¶] Sections 366.26 and 388, when construed together and with the legislative scheme as a whole, are reasonable and bear a substantial relation to the objective sought to be attained."].) Thus, that section 388 provides such an "escape mechanism" *in practice*, not just in theory, "is vital to the constitutionality of our dependency scheme as a whole, and the

19

termination statute, section 366.26, in particular." (*Kimberly F., supra*, 56 Cal.App.4th at p. 528, italics omitted.)

It follows that, in determining whether a parent has rebutted this presumption, a court may "not simply compare the household and upbringing offered by the natural parent or parents with that of the caretakers." (*Kimberly F., supra*, 56 Cal.App.4th at p. 529.) Were this the analysis, given the focus at this stage on stability and permanence, in any case involving a foster placement with excellent care and/or more resources and opportunities for the child than the biological parents may be able to offer, section 388 would not serve as the important due process check the California Supreme Court has described it to be. Thus, rather than such a "one dimensional" simple best interests *comparison*, a court must perform a more nuanced best interests *analysis*, considering, at a minimum: "(1) [t]he seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers," taking into account "any interest of the child in preserving an existing family unit, no matter how, in modern parlance, 'dysfunctional' " and "the complexity of human existence;" and (3) the nature of the changed circumstances and the reason a change was not made sooner. (*Kimberly F., supra,* 56 Cal.App.4th at pp. 530, 532, italics omitted.) These "factors will fall along a continuum, one extreme of which is the notion that just because a parent makes relatively last-minute (albeit genuine) changes he or she is entitled to return of the child, [and] the other is the obvious attractiveness of insuring that the child remains with highly functional caretakers. Neither extreme can be dispositive." (*Ibid.*)

Applying such an analysis to the instant appeal, we address together the first and third factors regarding the nature and timing of initial dependency jurisdiction and the nature and timing of changes in Mother's circumstances, as these factors are closely related here. Domestic violence certainly poses a serious threat to the well-being and safety of children in the home, but J.M. was never physically harmed, nor did he witness any such violence. (*Cf. Stephanie M., supra*, 7 Cal.4th at pp. 320–324 [reversing appellate decision instructing trial court to grant section 388 petition where basis of dependency jurisdiction was extreme battery of infant child]; see *Kimberly F., supra*, 56 Cal.App.4th at pp. 534–535 [distinguishing *Stephanie M.* based in part on this factor].) Mother was initially unwilling to acknowledge the issue and initially struggled to stay away from Father. But denying J.M. the benefit of being raised by his biological mother based on her mistakes early in the proceedings—particularly when she no longer posed a risk to him—would be to make the perfect the enemy of the good. The goal of dependency court proceedings is not to engineer perfect parents, but to protect children from harm. (See § 300.2; *Marilyn H., supra,* 5 Cal.4th at p. 307.) Moreover, a section 388 petition seeking reinstatement of reunification services or return of the child will necessarily involve a parent who has made mistakes sufficient to support termination of services at some point in the past. The question must be whether the changes the parent made since then are substantial enough to overshadow that prior determination, such that reunification is now in the child's best interests. That Mother did not immediately break free from the cycle of abuse does not render it in J.M.'s best interests to deny him the opportunity to be raised with his

21

biological mother and extended family, with all the benefits courts recognize this could offer him, particularly when, at the time of the hearing on her petition, Mother had for over a year avoided contact with Father and maintained stable, appropriate housing and gainful employment.

As to the relative strength of J.M.'s relationships with Mother and with Caregivers, the record reflects J.M. has a strong bond with Caregivers. Although a child's bond to foster parents is an important consideration, it "cannot be dispositive . . . lest it create its own self-fulfilling prophecy." (*Kimberly F., supra*, 56 Cal.App.4th at p. 531.) But Mother has also maintained a relationship with J.M.—despite only having a portion of one day each week with him—and that relationship, even according to DCFS, is blossoming. Mother's brothers and the paternal grandmother also offer J.M. an extended biological family, with whom J.M. could remain connected, if placed with Mother. This, too, is an important and beneficial aspect of the relationship between Mother and J.M. (See *id.* at pp. 529–530.)

In assessing Mother and Caregivers' relationships with J.M., we are cognizant of the fact that Mother was repeatedly denied overnight visits based primarily on DCFS's concerns about Mother's mental health that, at least part of the time, were unfounded. The court had deemed Mother's mental health a nonissue when it terminated reunification services in September 2018. Nothing in the record suggests Mother's mental health ever put J.M. at risk; indeed, at the time of the initial petition, the court struck the jurisdictional allegations based on her mental state. Since then, Mother's symptoms subsided and DMH determined that further treatment was not medically necessary. DCFS nevertheless cited mental health

as at least the primary basis for denying Mother overnight visits that may well have allowed her to develop a deeper bond with J.M. and more fully demonstrate her ability to care for him. Whether or not the court erred in refusing Mother's evidence of DCFS's claimed failure to sooner obtain (or realize that it already had in its possession) mental health records reflecting that Mother did not need mental health services or psychotropic medication is not directly before us. But the fact of the delay in resolving what the court deemed in September 2018 to be a nonissue nevertheless provides important context when considering the relative strength of Mother's and Caregivers' relationships with J.M.

J.M.'s special needs were the primary focus of the court's best interests analysis on Mother's petition. Although Mother was never required to participate in any training regarding her son's special needs, the court cited as a basis for its decision Mother's lack of such training, suggesting placement with Mother would not be in J.M.'s best interests because she was not prepared to deal with his development issues and autism. But neither the court's nor DCFS's view in this regard constitutes evidence that Mother was in any way incapable of or unwilling to care for J.M., nor does the record contain any such evidence. Indeed, the record contains evidence—which the court did not discredit—to the contrary. Namely, DCFS reports and testimony reflected that DCFS had no concerns about Mother's ability to care for her son's needs or her childcare arrangements. Moreover, nothing suggests that Caregivers, whom the court and DCFS rightly applaud for having assisted J.M. in making progress with his various issues, received any training prior to J.M. beginning services in their home. The court's speculation

that Mother requires such training—again, despite uncontradicted evidence to the contrary—is an arbitrary and unreasonable basis for concluding placement with her would not be in J.M.'s best interests.

Although J.M. came within the jurisdiction of the court based on domestic violence issues with Father that placed J.M. at risk, the court devised a list of ways, wholly unrelated to any risk of domestic violence, in which Mother needed to prove herself as a parent in order for her to earn back her child—obtain permitted housing, keep her home neat, or do some unidentified "training" regarding how to care for him. Failure to correct these purported problems would not have created a risk to J.M. independently sufficient to support juvenile court jurisdiction. (See, e.g., *In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1212 ["poverty alone, even abject poverty resulting in homelessness, is not a valid basis for assertion of juvenile court jurisdiction"]; *In re Paul E.* (1995) 39 Cal.App.4th 996, 1005 [home with shorted lamp socket, exposed motor boat propeller, and dirty wading pool did not justify removal of child].) Nevertheless, Mother did what the court asked of her (the court never ordered Mother to take any training regarding J.M.'s special needs; it merely faulted her after the fact for failing to do so). All the while, Mother never stopped visiting her son, never stopped asking for overnight visits and placement in her home. This shows a tremendous level of initiative and dedication, and suggests that it would be in J.M.'s best interests to be placed with her.

The court was certainly entitled to disbelieve Mother's testimony on various topics; after all, Mother had lied and been otherwise untruthful in the past. But the court did not have discretion to write off Mother as a parent entirely, or to force her

24

to prove an above average level of parental ability in order to meet her burden of establishing it was in her son's best interests to have a chance of being raised by his biological mother.

For all the reasons discussed above, we conclude the juvenile court abused its discretion in determining the substantial changes since termination of Mother's reunification services did not render placement of J.M. with Mother in his best interests. We therefore reverse the court's denial of Mother's January 2019 petition for modification. This necessarily requires reversal of the court's denial of a similar petition Mother filed on August 13, 2019, as well as the court's termination of Mother's parental rights. (*In re Sean E.* (1992) 3 Cal.App.4th 1594, 1599.) Therefore, we need not consider the Mother's arguments on appeal from these decisions (case No. B2301428).

**DISPOSITION**

The juvenile court's May 15, 2019 and September 30, 2019 orders denying Mother's section 388 petitions and the court's September 30, 2019 order pursuant to section 366.26 are reversed.

The court is instructed to enter a new order granting Mother's January 14, 2019 section 388 petition and immediately placing J.M. with Mother. Whether to implement a plan of family maintenance or terminate juvenile dependency altogether is a matter properly left to the juvenile court at this stage, and we express no opinion thereon.


                                        ROTHSCHILD, P.J.
We concur:


                CHANEY, J.


                WHITE, J.*

---

&ast; Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


26

Filed 6/17/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.M., JR., a Person Coming Under the Juvenile Court Law. | B298473, B301428 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. Y.C., Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK22314) CERTIFICATION AND ORDER FOR PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed on May 29, 2020 was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

ROTHSCHILD, P. J.          CHANEY, J.          WHITE, J.*

_____

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.